or arguments not to exceed 15 minutes. Mr. Edward Grosch for the appellant. May it please the court. Edward Grosch for the appellant, Scott Perreault. If Mr. Perreault had not been deprived of his fifth and sixth amendment rights to counsel, his trial would have looked completely different in a way that would have given the jury a very different picture of Scott Perreault's responsibility for his daughter's death. First, Mr. Perreault unequivocally requested counsel under clearly established law and yet the video of his interrogation was admitted at trial. That video and the statements within it permeated the entire a minimum, because that video is not part of the record, this requires a remand to the district court. Second, defense counsel's failure to properly challenge. Why is it not a part of the record here? Are you saying it's not a part of the record here on appeal? That's correct, your honor. It was not made a part of the record in the district court, which was an error, and because it was not made a part of the record there, it's not possible for this court under Rule 10, based on its precedence under Rule 10, to supplement the record to include it. So unfortunately, we're unable to rely on it at this stage of the proceedings. Did you make any motion to call this to our attention during the briefing? We did not, your honor. We discussed it at length and looking back at this court's prior precedence on this issue, it seemed that where there were other live issues, it had been fully briefed and argued and then addressed if there were material issues to be addressed on remand. So you didn't bring that to our attention during the briefing? We did not, your honor. Well, yes, your honor, sorry. In our briefing, we did. That was a major part of the appellant's brief. We explained why it was not part of the record and why it could not be made part of the record, why we believe that Mr. Perot should prevail nonetheless, but why a remand might be required. But we did not make a decision. Are you referring to the record not having his actual statement, the way he invoked his or did not invoke his right to counsel? The actual statement that he made, your honor, is part of the record because it was stated verbatim in the Court of Appeals opinion and under this court's precedence that's sufficient. What we don't have is a lot of the context, including the statements that followed, and of course, as it goes to the harmless error point, which is the existing record. We have in front of us, partly through the state court opinions, quite a few of statements, both the actual alleged invocation and some of the things before and after. Are you saying that what we have in front of us that's referred to in the state court opinion is inaccurate? That if you had the transcript, it would prove an inaccuracy? I'm trying to get the point you're making. No, your honor. You're saying it would just add still more color, more context? Absolutely. It would add more color and the key part of that may be the harmless error argument because as we argue in our briefs, we believe that the plain language of the statement was an invocation under clearly established law. So, but if there's not a harmless error problem, if that's not the way we handle it, I mean, this gets at pedeference, right? Right. And so if it's not a clear invocation and they're at pedeference, that all melts away. Am I right about that? You're right, your honor. Yes. If you can tell based on the record that there's no way this could be a clear invocation under the EIPA standards. There's no need necessarily to remand. But opposition is that this was... Why don't we talk about this alleged invocation? All right. So, I mean, he says, it's a funny statement. Well, then let's call the lawyer. So first of all, it's let's as in we. That's a strange, there's something odd about that. That's not how it works. It's not a lawyer for everybody, right? It's a lawyer for your client. But I gave what I could. And that's odd to me. That's a little hard to understand. To the state courts, that had a negotiation feel to it. You know, I've done my bit. Now I want some help from you guys. But that's really hard for me to understand. I gave what I could as being an invocation of counsel. It seems very much to qualify what in the world he's saying in the first part of the sentence. Your honor, opposition is that the first part of the sentence is itself clear enough and that any reasonable officer would understand based on that part of the statement that Mr. Perot is requesting counsel and does not want to continue asking questions without. But you have to take the whole... You're the one that's been talking about context. You surely have to take the whole sentence. Well, that's true. You should look at the entire sentence. But our argument is that I gave what I could actually strengthens his argument. It doesn't necessarily mean that he was as articulate as he possibly could have been. And of course, the Supreme Court doesn't require that. But it does mean that he was suggesting to the officers that he did not want to continue answering questions without counsel being present. And I think that's significant. And I also think that even though he didn't say it with absolute clarity, when you compare it to cases the Supreme Court has found to show unambiguous invocations and to post-EDPA cases in this court. What's the best Supreme Court case on that one? I think there are a couple, but one good example is the Edwards case where... Just give us the language. I want an attorney before making a deal. There I think you could argue that before making a deal qualifies the first part of the sentence in the same way because it suggests that it's conditional on some particular making a deal proceeding. Similarly, in Kiger v. Carlton, which is a published opinion of this court, post-EDPA, the suspect said, I'd just as soon have an attorney because, you know, you all say there's been a serious shooting involved and that's a serious charge. I think in the same way that could add some possible ambiguity, but I still think that a reasonable officer looking at that statement as a whole, particularly the force in the first part of the statement, does in fact suggest an unambiguous invocation. I think it's also important to go back, Judge Sutton. He does say maybe. No, not in this statement, Your Honor. The statement was, well, then, let's call the lawyer then. Well, then, is that what he says? Well, then. In our statement that we're talking about here. Yes, Your Honor. It's, well, then, let's call the lawyer then because they gave what I could. And just to look again at the word let's because you asked about that, Judge Sutton. Again, I think a reasonable officer there would understand that to be an unambiguous invocation. The way that word is used in the English language can suggest that we want a particular thing. If we are making plans to go to dinner and you say, it's your choice where we go. And I say, okay, let's go to McDonald's. That being my choice, I've indicated that's what I want to do. And the same thing I think here is true for Mr. Perot. The Miranda rights have been read. He has mentioned an attorney on previous occasions, although perhaps not with the clarity that the precedent requires. And now he's saying that that's what he wants to do. I think that that statement made a huge impact on the trial. And as I mentioned earlier, it did it in two ways. First, in the way that the state used that in the invocation, sorry, the post-invocation statements. And second, in the way that the use of those statements affected Mr. Perot's own strategy. To look at the way the state used it, we need look no further than the opening and closing. In the opening statement, the state leads with the inconsistencies in Mr. Perot's statements. Those inconsistencies can only have come from comparing his initial statements at the scene to the statements that were made during the interrogation. One of the state's very first points in closing is look hard at his statements and see how they progress. Again, the progression goes to the statements that were made during the interrogation. In rebuttal, the jury is told it would be, quote, insanity not to look at everything he has said and scrutinize it with a magnifying glass. And the state also pushed the context of the statements he was making in the interrogation. It's not just that they were inconsistent. It was the situation. His daughter at that point was lying in the hospital with very severe injuries. And he was told, though he didn't know the exact nature of them, that they were very severe head injuries. And yet, he was still, according to the state, not telling the truth there. In fact, later admitting to not telling the truth. That paints a very negative picture of him because it gives him some responsibility, but also he is not taking steps he might take to help the medical personnel fix it. When you then look at the impact on Mr. Perot's trial strategy, this court frequently in the Brecht inquiry discounts parts of evidence that have come in when those pieces of evidence were induced by the tainted evidence. And I think that's the case for Mr. Perot's testimony. As it was, it made sense for him to testify. He had already given several inconsistent statements and admitted to that. He also was caught giving these inconsistent statements at a time that was very crucial for Jenner's recovery. And so he had to give some kind of concreteness. Which statement is he relying on? And to explain why he was doing that even in the situation he was in. However, if those inconsistent statements had not been admitted, all the state would have had would be, on the inconsistent statements, would be the statements he gave to the officers at the scene, which were... Speaking strictly for me, you're pushing on an open door. I think the prejudice is fairly easy to show. But that's the second part of the inquiry, and the first part has an EDPA component to it. Yes, Your Honor. And my opposition on that is that the post-EDPA cases in this court have, as I said, Kiger v. Carlton being a significant one, but also Edwards from the Supreme Court, have recognized statements being less clear than this, yet still being unambiguous invocations under the Supreme Court's case law. We can compare those, I guess. We'll have to. Could you address your other issue? Yes, Your Honor. The cross-acts of Dr. how do you say, Diebel? Dr. Diebel, I believe. Yes, Your Honor. In responding to Dr. Diebel, Defense Counsel either did not investigate the basis for his opinions, or did investigate, but did not use it. Yes, Your Honor? Is there evidence that he did or did not investigate? There is not in the record. However, If you wanted to show that he didn't investigate, you'd have to have some evidence of that, right? In most cases, yes. In this one, he was ineffective as a matter of law. Dr. Diebel Cross-examined, didn't he? He did very briefly. He did very briefly, but all his cross-examining He had to cross-examine more? His cross-examination only established two things. One, that Dr. Diebel was indeed very certain of his opinion, and two, trying to probe Dr. Diebel's qualifications, and perhaps a pathologist would be better. Going to this issue, however, Dr. Diebel told the jury not just that he was sure that this could not have been the result of an accidental fall, but that this fall, if an accident, would have been new in the literature. It would have been literally the first time in known respected medical literature that this had come up. And yet, Dr. Plunkett's study, which was made a part of the record in the state court and the district court, specifically says, in its first line, Physicians disagree on several issues regarding head injuries in infants and children, including the potential lethality of a short-distance fall and a lucid interval in ultimately fatal head injuries. That study included children who had fallen from less than three feet onto grass and padded carpets among a study of 18 children, and yet had suffered skull fractures. You just have a little time left. At what level was this study initially raised? It was initially raised in the state court. It should have been raised on direct appeal under Michigan standards, and that's the reason for the procedural bar that we've briefed on here. But it was then raised in collateral review. How did the state court review? What did the state court say about it? I believe, Your Honor, the state court did not touch on that particular issue, just found that the failures cross-examined was within the strategic prerogative of defense counsel. Just one real quick fact question. At the time Counsel for Perot cross-examines Dr. Dreibel, did he have access to what Dr. Varani was going to say? Is that something that was already in front of him, either as braiding material or whatnot? I don't know, Your Honor. I don't want to give an inaccurate answer on that. See if you can figure that out for rebuttal. Yes, Your Honor. Thank you. I'd like you to answer that same question. Thank you. Do you know the answer to that question, what I just said? Do you hear what I just said? Yes, yes. Would Counsel for Perot have had access to what Varani, the essence of what Varani was going to say later? I cannot answer yes or no based on the record, but I would find it hard to believe that there would be no report from the medical examiner. Yes, because wouldn't the norm be the prosecutor has to give all the information? Correct, including autopsy reports. Particularly since his testimony was going to be different from Dreibel's. Correct. So, it would be required under Brady, wouldn't it? Yes, absolutely. And just to introduce myself, I'm Andrea Christensen Brown of the Michigan Attorney General's Office, appearing on behalf of Warden Willie Smith. To go back to Your Honor's question, it would have to be turned over under Brady, autopsy reports, any additional evidence that Dr. Varani was basing his opinion on? And what better way to attack the prosecutor's case than to pit their own two experts against each other? And that's exactly what he did here. Dr. Dreibel is an ER doctor, and he said, no, I'm not a pathologist. They might be able to testify about the velocity in which the infant was struck in the head. But based on my experience, what I see in the ER, I can tell you that the injuries that this four-month-old suffered were not the result of a short-distance fall. Now, defense counsel, on the other hand, touted Dr. Varani's testimony, saying, you're not a pathologist. Dr. Varani said it is possible during cross-examination for Mr. Perot to have fallen with the infant in the kitchen and for her head to have struck something. This is a cross-examination of? Of Dr. Varani. Defense counsel's cross-examination of Dr. Varani. He said it was possible for there to be a short-distance fall and for there to be a significant head injury. However, after that, which was unfortunate for Mr. Perot, Dr. Varani said, but there is no other evidence that this was a short-distance fall, meaning there were no other bruises to the infant if there was some sort of crushing motion, which was Mr. Perot's defense at trial. So the effect of the cross-examination shows that defense counsel did look at short-distance falls. And it is a solid strategy. I'll argue until I'm blue in the face. It's a solid strategy not to call your own expert and to pit the two prosecution experts against one another, saying, hey, we disagree. If you know ahead of time that one of them is going to go in that direction. That's fair. Yes, Your Honor. And that's what you say you don't know. Not from the record, but from Brady knowing that the prosecution has to turn over every piece of evidence that it's relying on. I would say it's highly likely that he was aware that that was going to be the defense. Or excuse me, that that was going to be Dr. Varani's testimony. And also regarding Mr. Plunkett's study, and in addition, the three other studies that were presented at the state court, Dr. Plunkett, in particular, is a frequent flyer in testifying at trials where there are head injuries to children. His studies, and they were provided in the record in the district court, so this court has access to them, mostly regard shaken baby syndrome, meaning the absence of skull fractures. And here, we know from the autopsy, we know from Dr. Varani's testimony when he performed the autopsy that there were multiple skull fractures to this girl's head. Therefore, Plunkett's, any testimony that Mr. Plunkett could have possibly given wouldn't go to that. The fact that there were no... She gets epidepherence because the state court decided it without mentioning it. The state court did not mention those particular studies, but when it was analyzing the ineffective assistance of counsel issue, it outlined the counsel's cross-examination, and stated clearly he investigated it because he asked all of these questions, and those questions were to cover... Excuse me, I'm paraphrasing, but were sufficient to establish effective assistance, which is both prongs. So epidepherence is due to both the deficient performance prong, as well as prejudice. And I do want to spend some time going back to the statements that Mr. Perot made when he was in police custody. Mr. Perot makes a big deal about the statements given at the house, the statements that he gave to the 911 operators, statements that he gave to his girlfriend, his fiancee, that he gave to Officer Williams when he arrived on scene, and that he gave to Dr., excuse me, Detective Doyle and Detective McInerney when they were on scene. Only after those statements was he taken to the police station, and then even assuming that this was an unambiguous request for counsel, I don't concede that, I don't think it is. However, even if it was, all of the previous stories that Mr. Perot told would have been completely admissible. The story that he told 911 was that she was dropped, that she was just dropped. We know that that was a lie. And then the story changed when Jamie came home, the mother, and he said she had a seizure. She fell off the bed. That's another story. You're making a lack of prejudice argument? Pardon me? Are you making a lack of prejudice argument? Well, it goes both ways, Your Honor. It goes to the lack of prejudice for the ineffective assistance prong and also for harmless error. All of these inconsistencies, whether or not this court determines that it was an unambiguous request for counsel, all of these inconsistencies were made before he made that statement. How do we know? Is that, is this enough in the record to demonstrate that? Absolutely, Your Honor. The record is very clear what statements were made then. Do we have a transcript and not a recording then, or we don't have a transcript, or what? All of the transcripts of trial, including all of the officers' testimony, the 911 operators, the first responders, all of that is in the trial record, the testimony. The video itself is not in the record before the district court or before this court. Was there a transcript of the video? No, sir. No, sir, there was not. I'm having trouble seeing what's... You say all these things. How do we know all that stuff was in there if there's no transcript? Through the progression, we know that Mr. Perot gave these statements at the scene. There has been no argument. You're just talking about statements at the scene. I thought you were talking about statements before he allegedly asked for a lawyer in the recording. You're not relying on those, or you are? No, no. I'm not relying on anything in the recording. I'm relying on everything that is in the record. Can I just, you can keep going down this road, but can I just tell you what's going through my head as you do this? Yes, Your Honor. So we're talking Sixth Amendment. Let's just focus on that and invocation of right to counsel. So the only reason this could be relevant is that it's a harmless error, okay? And I think what you're trying to say is, well, look at all these contradictions. He already had a serious contradiction problem before the alleged invocation, and he later said other things. What is the worst part for him is what he says after the alleged invocation. That's very damning after all of these, well, it was this, it was this, it was this, oh, okay, fine, it was this. So I don't know where you're going with this. I think it's not harmless error, or I think it's a very compelling case that it's not harmless error because of the contrast between what they were allowed to hear, but then what he says after the alleged invocation. So it strikes me that the key thing is the AEDPA question of whether he actually invoked his right. But I could be wrong. Tell me why that's a wrong way to think about it. The AEDPA question on the unambiguous or ambiguous nature of his statement is absolutely primary. But after that, we do, respectfully, Your Honor, I disagree with what you're saying about what he stated after he allegedly invoked his right to counsel. They're all of the discrepancies that Mr. Perot on the other side is saying were damning to his strategy, meaning that he had to change his story as, you know, excuse me, that he's telling the jury, look at the progression of his statements. The only statement that came in after he invoked his right to counsel, and this is from the record that you can surmise this, was the fact that he fell on the child in the kitchen and his leg hit her abdomen. That is the only statement that came in after he invoked his right to counsel. Every other statement, the fact that she had a head injury and that the story changed from the padded carpeting in the master bedroom to the linoleum in the kitchen, all of that came in before that statement. So let's, for the sake of argument, say that that was an unambiguous request for counsel. It will have no impact on every other discrepancy that he gave. I think we understand that. I have a similar concern to Judge Sutton as to whether it was ambiguous in the first place. Okay. I would point the court to, we know that Davis is a general standard. That's been stated in several opinions. And that allows for leeway given to the state courts to analyze those sorts of issues. And so I would like to argue that McKinney, the Sixth Circuit case of a different panel from this court, it's McKinney v. Hoffner, is actually instructive on this point. The conversation that was had here was Mr. Perot says, well then, let's call a lawyer then, because I gave what I could. The officer in turn said, okay, that's fine. And he says, there's no reason for anyone to take me to jail. And the officer says, well. That's absolutely what he says then. Correct. Correct. So the officer said, that's fine. We'll get you counsel. And then Mr. Perot is the one who proceeded with the conversation. You're relying on things that he said after this allegedly unequivocal statement. And that is something that McKinney v. Hoffner flushes out and determines is allowable under. Was he giving up on the argument that it wasn't ambiguous before? No. He fuzzed it up later? No, no. I'm arguing in the alternative, Your Honor. I'm trying to get the original argument, not the alternative argument. I argue that it's not. I think it's your strongest argument, and I wonder if it holds water, basically, just to be candid. Okay. And does it hold water or not? The statement, before you look at what they said afterwards, I mean, he could say, darn it, I want a lawyer right now, get me a lawyer. And then two minutes later say, I didn't mean it, I don't need a lawyer. That's not what you're arguing, right? You're arguing that the first one was sufficiently ambiguous, right? Correct, along the lines of what Judge Sutton was saying to my opposing counsel. I'm asking, does that argument hold water? Yes. And you're saying, well, I've got an alternative argument. I want to know about that argument. Yes. That one does hold water. Why is that? Because it looks like I want a lawyer. It says let's, what is it again, literally? I don't have it. Maybe I do. Well, then, let's get a lawyer. What's ambiguous about that? I agree with Judge Sutton's comments to opposing counsel that let's, it wasn't the equivalent of what Your Honor just said. Well, gall darn it, I want a lawyer. Those two statements are not equivalent. I understand that's the argument. What's the difference? Not to use the language of the rule, but one is somewhat ambivalent and the other one is direct and sound. Let's go is ambivalent? Maybe it is. I don't know. Let's go means let's think about going? Yeah. I think that that's fair. However, all of this comes back. Whether this court views his statements as ambiguous or unambiguous, it ultimately does not matter, number one, because of epidefference, and number two, because any error was ultimately harmless, given the overwhelming nature of the evidence presented. My apologies if the argument didn't seem clear. I'm happy to clarify. Well, it's clear. It's just you're focusing on the alternative argument. I'm just puzzled about the primary argument. Okay. All right. That's fair, but I would suggest that let's call an attorney then, because I gave what I could. The way that I read that statement and his previous statements, which are allowable, is that he knows that an attorney is an option and he wasn't clear about it. I'm happy to answer any more questions. We would ask this court to affirm. Thank you. Thank you. Any rebuttal? Yes, Your Honors. Three brief points. It seems that the first prong of Miranda is very much an issue. We refer you to pages 20 to 24 of our brief, but also to focus in on McKinney there. In that case, you're correct, Judge Rogers, that it really focuses on the post-invocation statements, in a very narrow exception. The language there is also relevant, though. The actual statement itself was, well, if you don't mind, I just assume wait until I get a public defender or whatever, and then continue on from there. The focus of the court was on post-invocation statements, not on the language there that the court seemed to find unambiguous. Just to be clear, the phrase is, well, then let's call the lawyer then, because I gave what I could. You do concede we have to consider that whole sentence. We can't just consider the first part of the sentence. I think it makes sense. You concede that? Sorry, repeat that last part? You concede that we have to consider the whole sentence as opposed to just the first part of it. I think you have to consider the whole sentence. You could say, well, then, let's call the lawyer, because I understand he has tickets to the ball game. Absolutely. I mean, there's nothing to do with invoking your right to counsel. So you do have to consider the whole sentence. Yes, and the second part of the sentence is going to the fact that Mr. Perot does not want to continue answering questions without counsel present. Second, if I may answer your previous question from the end of opening, Judge Sutton, if you look at page 246 and 252 of the record, that's where Dr. Varani testifies in the preliminary examination. The autopsy report is not in the record, but of course that will not necessarily show what he has to say about whether this fall could have been accidental. In the preliminary exam, he says carpeted floor definitely would not do it and then repeats. What does he say? He says that a fall on carpeted floor or on linoleum definitely would not cause injuries of this magnitude if it was an accidental fall. And finally, just to correct any inconsistency. Is your answer that Perot's counsel would have had access to Varani's testimony ahead of time or at least his theory? The answer is no, Your Honor. The answer is that he would have had access to the autopsy report, but not necessarily to the... Why wouldn't the prosecution have been obligated to turn over something that conflicted with their other medical witness? It's possible under Brady that they would have turned that over. My point is a narrower one, which is simply that saying that the autopsy report would routinely have been turned over and we know that there was a record of that, it doesn't answer the question about whether... So short answer is we're not sure whether Perot's counsel would have had known what Varani's theory was, okay? That's correct. Here's the reason we're asking that question. Dribble testifies first. You're focused on the cross-examination of Dribble and whether that's ineffective. And one way to think about it is, well, you measure ineffectiveness by what happened overall, which means you're allowed to consider what happened later, and that supports the idea, well, Perot's attorney could have decided to rely on the conflict between the experts. But the other way of thinking about it is, well, how can you credit him with that if he didn't know Varani was going to testify later? I guess my theory is you judge effectiveness by the scope of the whole trial. You can't punish him for being, you know, if it works out that it's a sound strategy by what happens later, it turns out to be a sound strategy, whether you're justified with it or not. I think that's true, Your Honor, but two brief points, and I may just respond briefly to that. First of all, even if you look at Dr. Varani's testimony as well, the best that defense counsel is able to get out of him is maybe it's theoretically possible. He also said in his testimony a thousand things are theoretically possible, meaning I don't think that's likely the cause, but who knows, maybe. Second, and finally, if you look back at Dr. Dribble's testimony, he was the key or at least one of the key witnesses on the key piece of medical evidence, and he said in that that the literature does not contain any indication whatsoever that this could have been an accidental fall. Any jury would have been left with the impression that this just could not possibly be an accident, and yet there is literature easily discoverable through a very brief investigation stating that this could be, directly contradicting his statement. We know from that that it was not a reasonable strategic decision because he either didn't investigate or, having investigated and found evidence that directly rebutts it, did not even admit it in cross-examination. Thank you, Your Honor. As we ask that you reverse and remand. Thank you. And Mr. Roche, I know you have taken this case pursuant to the Criminal Justice Act, and the Court appreciates you doing that as a service to the Court. Thank you very much. The case is submitted, and once the table is clear, the next case may be called.